526 So.2d 871 (1988)
CHEROKEE FARMS, INC., and Bill Adams
v.
FIREMAN'S FUND INSURANCE COMPANY, INC.
86-979.
Supreme Court of Alabama.
April 15, 1988.
Robert H. Ford and Richard Chesnut of Brinkley & Ford, Huntsville, for appellants.
W. Stanley Rodgers and Robert E. Ledyard III of Ford, Caldwell, Ford & Payne, Huntsville, for appellee.
*872 MADDOX, Justice.
Plaintiffs appeal from the insurer's summary judgment in a suit based on the insurer's payment of insurance proceeds to the plaintiffs' mortgage holder, rather than to the plaintiffs directly.
A fire destroyed the poultry complex operated by Cherokee Farms, Inc. At the time of the fire there were two outstanding mortgages on the complex. The first mortgage was held by the Federal Land Bank of New Orleans and the second was held by the Farmer's Home Administration ("FmHA"). Cherokee Farms was insured by Fireman's Fund Insurance Company, Inc. ("FFI"). The insurance policy provided that in case of loss the payment would be the actual cash value of the property at the time of the loss, and it also contained an endorsement to provide that if the destroyed property was later replaced (under certain conditions) then the loss would be valued at the "replacement cost," resulting in an additional payment to the insured.
After the fire, FFI paid the insurance proceeds first to the Federal Land Bank of New Orleans and then to FmHA. The mortgage held by the Federal Land Bank of New Orleans was completely satisfied, but the FmHA loan was only partially satisfied. Thereafter, Bill Adams, Willie Joe Estes, and Jo Estes, the owners of Cherokee Farms, Inc., divided the corporate assets and debts and dissolved the corporation.
Adams then decided to rebuild the poultry operation and take advantage of the replacement cost provision of the insurance policy. It is undisputed that Adams talked with representatives of FFI on several occasions to determine exactly what rebuilding plan would qualify under the policy. It is also undisputed that the plan Adams adopted met the requirements of the replacement cost provision and qualified for the payment of additional proceeds of approximately $197,000. The problem in this case is how the additional payment was made.
When Adams finished the reconstruction (which also involved the purchase of another poultry complex) and had it approved by an FFI adjuster, he requested that his payment from FFI be made in three checks one for $80,000 made payable jointly to Cherokee Farms and Chore-Time Equipment Company; one for approximately $55,000, made payable jointly to Cherokee Farms and the Bank of Ardmore; and one for approximately $62,000, made payable to Cherokee Farms. FFI made the check to Chore-Time as requested, but wrote the other two checks as jointly payable to the FmHA as well as to the parties Adams requested. Adams made several attempts to have the checks reissued as he had originally requested, but, on advice of counsel, FFI refused. Adams was able to get the check to the Bank of Ardmore endorsed by FmHA, but the other check, for $62,000, was retained by FmHA. Adams contends that because of the "loss" of this $62,000 he was unable to fulfill a contract he had with T & L Egg Farms and that that inability led to damages, for which he and Cherokee Farms, Inc., brought this action against FFI.
The plaintiffs' complaint stated three causes of action: first, that FFI had breached the insurance contract; second, that FFI was negligent and/or wanton in making the check for $62,000 jointly to them and the FmHA; and, third, that FFI had defrauded them. The trial judge granted FFI's motion for summary judgment on all the claims, and the plaintiffs brought this appeal.
Our rule of review on summary judgment is well settled. Summary judgment is proper only if there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law. Rule 56, Ala.R.Civ.P. If there is a scintilla of evidence supporting the position of the non-moving party, summary judgment should not be granted. Cole v. First National Bank of Tuskaloosa, 485 So.2d 717, 719 (Ala.1986). A scintilla has been defined as a "mere gleam, glimmer, spark, the least particle, the smallest trace." Howard v. Crowder, 496 So.2d 31, 32 (Ala.1986).

I
We first turn to the plaintiffs' breach of contract claim. The plaintiffs argue that *873 FFI breached its contract with them by making the two checks jointly payable to them and the FmHA. We disagree. The plaintiffs contend that the absence of any reference in the endorsement to the interest of the Federal Land Bank of New Orleans or FmHA as loss payees of the replacement cost proceeds, combined with the reference in the endorsement itself to the obligation of the insured alone to replace the damaged premises, created an ambiguity in the terms of the contract.
"Alabama law requires the trial court to determine whether a contract is ambiguous, and if it is not, to determine the force and effect of the terms of the contract as a matter of law." Wigington v. Hill-Soberg Co., 396 So.2d 97, 98 (Ala. 1981). The threshold issuewhether the contract is ambiguousis itself a question of law. Brown Mechanical Contractors, Inc. v. Centennial Insurance Co., 431 So. 2d 932, 942 (Ala.1983).
The trial judge in this case must have determined, based on the evidence presented, that the contract was not ambiguous, as a matter of law.
We agree with his determination. The fact that the endorsement did not refer to the mortgagees by name is not persuasive. The first paragraph of the endorsement states:
"1. In consideration of the premium of the policy to which this endorsement is attached, and only with respect to property to which this endorsement applies, the provisions of this policy are amended to substitute the term `replacement cost (without deduction for depreciation)' for the term `actual cash value' wherever it appears in this policy subject, however, in all other respects to the provisions of this endorsement and of the policy to which this endorsement is attached."
This paragraph clearly states that the endorsement is subject to all of the provisions of the original policy. The policy, in turn, states that the insurance company's first obligation is to pay off any outstanding mortgages (a so-called "standard mortgage clause"):
"B. Mortgage Clause: Applicable to buildings only ...: Loss, if any, under this policy, shall be payable to the mortgagee named on the first page of this policy, as interest may appear under all present or future mortgages upon the property herein described in which the aforesaid may have an interest as mortgagee in order of precedence of said mortgages, and this insurance as to the interest of the mortgagee only therein, shall not be invalidated by any act or neglect of the mortgagor or owner within the described property...."
We hold that the contract is not ambiguous and that the trial judge properly interpreted it as a matter of law, and decided that FFI did not breach its contract with the plaintiffs. We therefore hold that summary judgment was proper on this claim.

II
We next turn to the plaintiffs' claims of negligence and/or wantonness. The plaintiffs claimed that FFI acted either negligently or wantonly, or both, in the way it discharged its obligations under the insurance contract. The issue is whether the plaintiffs presented a scintilla of evidence that FFI acted either negligently or wantonly. The plaintiffs urge that the following statements from the deposition of plaintiff Bill Adams support their position on this point:
"Q. Did you have any conversation with anyone with Fireman's Fund regarding the issuance of the check, Exhibit 31, in the manner in which it was issued?
"A. Yes, sir. I talked with Ms. Chris Heimseth.
"Q. When was that?
"A. I don't know the date. I am sorry. But it was quickly after I received the check, whatever the date is on that check, 2 or 3 days after that
"Q. Did your conversation with her take place before or after that letter?
"A. My conversation with her took place before this letter was written, the first conversation. I talked to her several times.

*874 "Q. And tell me, if you will, please sir, the conversation that you have had with her as best you can, date it, and the substance of that conversation.
"A. My first conversation with her, of course, was just to say to her that we have completed theor we are close to the completion or something. And I wanted to know how quick the checks could be written after we finalized our construction and got an inspection from their agent, Mr. Rodgers.
"Q. So that conversation would have occurred prior to the issuance of the check in question?
"A. Yes, sir. And in this conversation, leading up to this letter, she had told me on the telephone that the checks would be cut. And let me read this. It's been so long.
"She told me that two of the checks would be made jointly with FmHA's name on them. She had told me that the check for $80,000 would be made without FmHA's name on it.
"And I had told her at that time that that would be very difficulput us in a very difficult situation, because FmHA had not been paid in full. And even though this had nothing to do with their mortgage, with their name on it, it would create serious problems for me.
"And she suggested that probably Mr. Ritchey [of the FmHA] would just endorse the checks and turn them over to me. And I said that's not the way it should be, because I shouldn't be negotiating with him to give me my money. You should make the checks without his name on it. And she agreed that that's the way the checks should be drawn.
"Q. Which way the checks should be drawn?
"A. With FmHA's name off of it. She didn't think FmHA's name should be on either of the checks, the way she understood their policy as involved replacement insurance.
"* * * *
"So when I got the checks, all I thought I needed to do was call Ms. Heimseth and say look, you have got these checks improperly drawn, and I want to mail them back.
"And when she told me she would try to get it corrected, later called me to tell me that legal counsel told her that the checks would have to be left like this, her conversation to me was that they didn't necessarily think FmHA's name had to be on the checks. But since FmHA's name had to be on the policy and there would probably be no problem with getting FmHA to endorse the checks, which they were not entitled to anyway, and give them to me, it would just be simpler to go get them to endorse them.
"They didn't know Mr. Ritchey, of course. And they didn't know the Federal Government's method of doing business. Then I called Tom Rodgers and told Tom, I said Tom, we have a problem here, and Mrs. Heimseth can't get it handled.
"He said well, let me call legal counsel. I will get it straightened out. He honestly thought he could get it straightened out. Then he called me back to say he got his hand slapped."
The plaintiffs argue: "[T]here is ample indication that the Appellee knew or should have known that issuing the replacement proceeds checks with Farmer's Home Administration named as joint payee would cause the appellant difficulty in obtaining money rightfully payable to him."
We fail to understand how FFI was guilty of either negligence or wantonness. The mere fact that FFI knew that paying the proceeds according to the contract would cause the plaintiffs "difficulties" does not create a cause of action in either negligence or wantonness. The plaintiffs cite Malone Freight Lines, Inc. v. McCardle, 277 Ala. 100, 167 So.2d 274 (1964), to support their position. They argue that a legal duty may arise out of a contractual relationship, making a party's failure to perform its obligations under the contract a tort as well as a breach of the contract.
That case is not here dispositive. Neither the testimony quoted above, nor the rest of the record before the trial judge at the time he granted the summary judgment, *875 presents a scintilla of evidence that FFI failed to perform a contractual obligation on behalf of the plaintiffs. In addition, we have already held that the insurance contract was unambiguous, and FFI acted in accordance with it. This claim was not supported by a scintilla of evidence, and the trial judge properly granted summary judgment.

III
Third, the plaintiffs amended their original complaint to allege fraud, both by misrepresentation and suppression, under Ala. Code 1975, §§ 6-5-101 and -102.

A
Turning first to the suppression question, we hold that the trial judge properly granted summary judgment as to this claim. One charged with fraudulent concealment under Ala. Code 1975, § 6-5-102, must be under an obligation to communicate, either by virtue of the existence of a confidential relationship or from the particular circumstances of the case, or must knowingly conceal a material fact with intent to deceive. As a matter of law, one can only be liable for concealing facts of which one has knowledge. Harrell v. Dodson, 398 So.2d 272 (Ala.1981).
In this case, the plaintiffs did not present a scintilla of evidence that any agent or employee of FFI had knowledge that was concealed from them. To the contrary, the statements of the agents of FFI presented to the trial judge at the time he granted summary judgment show that none of the agents of FFI knew that the proceeds would be jointly payable to FmHA. Because the plaintiffs did not present a scintilla of evidence to support their claim that the agents of FFI concealed knowledge, the trial judge properly granted summary judgment on this claim.

B
The plaintiffs' only remaining claim is fraud by misrepresentation. In order for a case to go to the jury on a claim of misrepresentation under § 6-5-101, the plaintiff must adduce at least a scintilla of evidence on each of the following four elements of fraud: "[T]here must be (1) a false representation (2) concerning a material existing fact (3) relied upon by the plaintiff (4) who must be damaged as a proximate result." Bank of Red Bay v. King, 482 So.2d 274, 281 (Ala.1985), quoting International Resorts, Inc. v. Lambert, 350 So.2d 391 (Ala. 1977).
It is undisputed that plaintiff Adams entered a long series of negotiations with FFI to make sure that his various plans for rebuilding his business would qualify for the replacement cost proceeds of the insurance policy. The plaintiffs claim that two employees of FFI made the following false representations regarding material facts: 1) that the plaintiffs would be entitled to the entire proceeds of the replacement cost endorsement and 2) that the replacement cost proceeds could not be used to pay off old debts.
Under § 6-5-101, a cause of action exists for misrepresentations of material fact made "by mistake and innocently" where such misrepresentations are "acted on by the opposite party." See Freeman v. First State Bank, 401 So.2d 11, 13 (Ala.1981).
In his deposition, Thomas Rodgers, the adjuster who handled the claim for FFI, stated:
"Q. Did you have discussions with Bill Adams before he underwent this project with T & L Egg Farms along the lines that the replacement insurance would not be available in any event for payment on old debts?
"A. Yes, I'm sure I did. It is not devised, not a part of coverage to financially clear up old debts. It does require replacement of the damaged or destroyed property.
"Q. So are you satisfied that Bill Adams went forward with his project with T & L Egg Farms under the belief that he would be entitled to the entire amount of $197,000 some odd dollars for use on the new facility unencumbered by mortgagors or unencumbered by previous debts?
*876 "Mr. Rodgers: We object to that. How is he going to know what's in that man's head?
"Mr. Ford: From your conversations with him.
"Mr. Rodgers: How is he going to be able to answer that what this guy thought over here?
"The Witness: I'm sure that any encumbrance by previous debts was not considered a part of it. When I say that, that's based upon conversation, because I had told him that it would not be available for contribution or payment of old debts, that it was solely for the reconstruction and had to be, you know, it would be paid by the company only after reconstruction had been completed.

"Q. I understand.
"A. I don't know specifically that we ever really discussed the issue of whether that old debt would follow up to this new location or not.
"I would suspect that both of us just didn't anticipate that it would and we didn't discuss it. I don't believe we did.
"Q. Do you know who made the decision to put FmHA on two of Mr. Adams' checks or two of Cherokee Farms' checks under the replacement funds?
"A. No, I don't. That would be done in Chicago where the checks were issued...."
As we have already stated, the terms of the policy are clear and unambiguous. Fireman's Fund fully complied with those terms and made payment for the fire loss in accordance with the contract. There cannot be actionable fraud unless there is justifiable reliance and we find no evidence to support the insured's claim of reliance, in view of the law set out in Torres v. State Farm Fire & Cas. Co., 438 So.2d 757, 758 (Ala.1983), in which this Court affirmed a summary judgment even though there was some evidence that the insured was told that he would be covered for flooding, and the policy did not so provide. In Torres, this Court stated:
"A cause of action for misrepresentation exists when the plaintiff relies on a misrepresentation of a material fact and suffers damages as the proximate result of his reliance on the misrepresentation. Section 6-5-101, Code of Alabama. Furthermore, under Alabama law, an insurance company may incur liability as a result of the negligent misrepresentations of its agents. Woodham v. Nationwide Life Ins. Co., 349 So.2d 1110 (Ala.1977).
"Because it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one's own interest, the right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interest. In order to recover for misrepresentation, the plaintiffs' reliance must, therefore, have been reasonable under the circumstances. If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover."
438 So.2d at 759.
This Court, last term, discussed the doctrine of Torres in Woodlawn Fraternal Lodge No. 525, F. & A.M. v. Commercial Union Ins. Co., 510 So.2d 162 (Ala.1987), as follows:
"`Legal fraud' is defined by statute, Code of 1975, § 6-5-101:
"`Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud.'
"Under this principle, of course, the plaintiff's reliance must have been reasonable under the circumstances, Torres v. State Farm Fire & Cas. Co., 438 So.2d 757, 758-59 (Ala.1983):
"`Because it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one's own interests, the right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard *877 their interest. In order to recover for misrepresentation, the plaintiffs' reliance must, therefore, have been reasonable under the circumstances. If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover. Bedwell Lumber Co. v. T & T Corporation, 386 So.2d 413, 415 (Ala.1980).'
"Torres deals with a situation where the parties have initially entered into a contract. It says in effect that the policy of the law is that it is unreasonable to rely on oral statements when one is in possession of written documents that would put one on notice as to the validity of oral statements. By the same token, the written documents put the party to whom oral representations were made in a position to discover the falsity of those representations, thereby putting him on notice as a matter of law that a fraud may have been committed."
510 So.2d, at 164.
We are of the opinion that, based upon the circumstances of this case, and applying the principles of law stated in Torres, Adams's reliance upon any representation made to him was not "reasonable," as a matter of law.
Based on the foregoing, we are of the opinion that the trial court's order granting summary judgment is due to be, and it is hereby, affirmed.
AFFIRMED.
TORBERT, C.J., and ALMON and BEATTY, JJ., concur.
HOUSTON, J., concurs specially in part and in the result in part.
HOUSTON, Justice (concurring specially in part and in the result in part).
I concur in the portion of the opinion directed to breach of contract, negligence and/or wantonness, and suppression. I concur in the result as to the portion of the opinion directed to the claim for "fraud by misrepresentation."